IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CHESAPEAKE BAY ENTERPRISES, INC.,

       Appellant,

v.                                                        Civil Action No. 3:15CV35

CHESAPEAKE TRUST,

       Appellee.

## MEMORANDUM OPINION

This matter comes before the Court on appellant Chesapeake Bay Enterprises, Inc.'s

("CBE") appeal from the final judgment of the United States Bankruptcy Court for the Eastern

District of Virginia ("Bankruptcy Court").[1] CBE and appellee Chesapeake Trust ("CT") have

filed their respective briefs. (ECF Nos. 32, 35, 36.) The Court dispenses with oral argument

because the materials before the Court adequately present the facts and legal contentions, and

argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28

U.S.C. § 158(a)(1).[2] For the reasons that follow, the Court will reverse in part the decision of the

---

[1] For ease of reference and where applicable, the Court refers to the items in the record according to the page number assigned in the Appendix ("App."), located at ECF No. 35-1. CBE and CT stipulated to the evidence in the bench trial before the Bankruptcy Court. (*See* Br. Appellant CBE ("CBE Br.") 11 n.2, ECF No. 32.) Therefore, the Court adopts the facts as articulated by the parties in their Joint Stipulations of Fact and as accepted by the Bankruptcy Court in its Findings of Fact and Conclusions of Law ("Findings"). (App. 0001, 0024–32.)

[2] "The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under [28 U.S.C. § 157] . . . ." 28 U.S.C. § 158(a)(1).
    In its Findings, the Bankruptcy Court noted that "[t]his is a non-core proceeding under 28 U.S.C. § 157(c)(1), but one for which [CBE] has consented to the entry of final orders by the [B]ankruptcy [C]ourt." (App. 0002 (citation omitted).)

Bankruptcy Court and remand this case for further proceedings not inconsistent with this opinion.

## I. Standard of Review

"When reviewing a decision of the bankruptcy court, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal." *Paramount Home Entm't Inc. v. Circuit City Stores, Inc.*, 445 B.R. 521, 526–27 (E.D. Va. 2010) (citing *In re Webb*, 954 F.2d 1102, 1103–04 (5th Cir. 1992)). The Court reviews the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error. *In re Harford Sands Inc.*, 372 F.3d 637, 639 (4th Cir. 2004). A finding of fact is clearly erroneous if a court reviewing it, considering all of the evidence, "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985); *accord In re Mosko*, 515 F.3d 319, 324 (4th Cir. 2008). In cases where the issues present mixed questions of law and fact, the Court will apply the clearly erroneous standard to the factual portion of the inquiry and *de novo* review to the legal conclusions derived from those facts. *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond*, 80 F.3d 895, 905 (4th Cir. 1996).

## II. Factual and Procedural Background

### A.     Factual Background

This appeal arises out of a dispute between CBE and CT regarding entitlement to the $500,000 deposit ("the Deposit") CBE paid to debtor Potomac Supply Corporation ("PSC").[3]

---

[3] Appellee CT is the assignee of PSC's right to the Deposit pursuant to the trust agreement ("Trust Agreement") executed as part of the conversion of PSC's Chapter 11 bankruptcy to a Chapter 7 case upon the sale of PSC's assets to a third party. (App. 0479–81.) The Trust Agreement refers to the "Chesapeake Deposit Liquidating Trust," but no party suggests that this appeal involves the wrong entity. For ease of reference, the Court refers to Appellee as CT.

(CBE Br. 9; Br. Appellee CT ("CT Br.") 3.) CBE paid the Deposit in connection with the Asset

Purchase Agreement (the "APA") executed between CBE and PSC regarding the intended sale

of PSC's assets to CBE in the course of PSC's Chapter 11 bankruptcy proceeding.[4] (CBE Br. 9;

CT Br. 3.)

On January 20, 2012, PSC commenced a Chapter 11 bankruptcy case. (App. 0025.)

Regions Bank was PSC's largest secured creditor. *CBE IV*, 2014 WL 6685494, at *2. After

several months of litigation, PSC, Regions Bank, and the other interested parties in the

bankruptcy case "decided to work cooperatively in an effort to sell [PSC's] working assets."

---

[4] The Court declines to engage in a detailed review of the factual and procedural
background in this case and provides only the information necessary for the disposition of this
appeal. The Court assumes familiarity with the parties, the claims, and the litigation's history in
the Bankruptcy Court and this Court. Additional background can be found by reviewing the
cases listed below:

    (1) *In re: Potomac Supply Corp. (CBE I)*, No. 12-30347, Adv. Proc. No. 13-
        03073, 2013 WL 6865405, at *1–4 (Bankr. E.D. Va. Dec. 31, 2013) (Tice, J.)
        (granting motion to dismiss claims of defamation and insulting words in
        CBE's third party complaint against Pillsbury *et al.*);

    (2) *Chesapeake Trust v. Chesapeake Bay Enters., Inc. (CBE II)*,
        No. 3:13cv344, 2014 WL 202028, at *1–5 (E.D. Va. Jan. 17, 2014) (Gibney,
        J.) (denying motion to withdraw reference while finding that CT's complaint
        in the adversary bankruptcy case was non-core but that CBE consented to
        entry of final orders by the bankruptcy court implicitly and explicitly within
        the APA); and,

    (3) *In re: Potomac Supply Corp. (CBE III)*, No. 12-30347, Adv. Proc. No. 13-
        03073, 2014 WL 1661288, at *1–5 (Bankr. E.D. Va. Apr. 23, 2014) (Kenney,
        J.) (granting summary judgment to third party defendants Pillsbury *et al.* in
        CBE's third party complaint for actual fraud, fraud in the inducement,
        conversion, breach of fiduciary duty, and negligence), *aff'd, Chesapeake Bay
        Enters., Inc. v. Pillsbury Winthrop Shaw Pittman, LLP (CBE IV)*, No.
        3:14cv633, 2014 WL 6685494, at *1–5 (E.D. Va. Nov. 25, 2014) (Hudson, J.)
        (affirming bankruptcy court's granting of summary judgment in *CBE III* to the
        third party defendants Pillsbury *et al.* and dismissing CBE's conversion and
        breach of fiduciary duty claims), *aff'd*, 606 F. App'x 130, 131 (4th Cir. 2015)
        *(CBE V)*.

(App. 0025.) On July 27, 2012, PSC, by counsel, filed a motion regarding a potential auction of

PSC's assets (the "Auction Procedures Motion"). (App. 0025.) On August 16, 2012, the

Bankruptcy Court granted the Auction Procedures Motion and authorized PSC to conduct an

auction of its assets.[5] (App. 0026.)

Simultaneously, PSC considered a private sale of its assets. *CBE IV*, 2014 WL 6685494,

at *2. Between April 2012 and September 2012, PSC and CBE negotiated the sale of PSC's

assets to CBE. (App. 0027–28.) On September 17 and September 18, 2012, CBE paid to PSC

the $500,000 Deposit required in the APA. (App. 0028.) Thereafter, on September 21, 2012,

PSC and CBE formally executed the APA. (App. 0028, 0184–222.) In the APA, CBE agreed to

buy certain PSC assets for a purchase price of over $20 million. (App. 0028, 0186.)

Within a few days of the APA's execution, the contemplated transaction fell apart

because CBE lost its funding. (App. 0030.) On October 2, 2012, CBE's counsel notified PSC's

counsel of the loss of funding and requested that PSC withdraw its motion in the Bankruptcy

Court requesting approval of the sale to CBE and return of the Deposit. (App. 0384.)

Thereafter, CBE sought, and PSC granted, two extensions to the deadline to post a second

$500,000 deposit. (App. 0030–31, 0392–401.) PSC did not accede to CBE's request for a third

extension. (App. 0031.) CBE failed to post the second deposit by the extended deadline of

---

[5] Sections 8.3 and 8.8 of the APA directed that PSC take actions to facilitate approval of the sale in the Bankruptcy Court, including PSC's obligation to withdraw the previously filed Auction Procedures Motion and vacate the previously entered Auction Procedures Order. (App. 0205–06.) Such requirements were conditions to Closing. (App. 0192.) PSC, however, failed to file a motion to vacate the Auction Procedures Order.

Even in light of PSC's procedural omission, this Court does not find that the Bankruptcy Court erred in its analysis of whether PSC materially breached APA Sections 8.3 and 8.8, especially regarding waiver. Indeed, in spite of PSC's absent motion to vacate, as evidenced by two amendments to the APA, the Bankruptcy Court did not err in noting that CBE waived any purported breach by treating the agreement as ongoing. (App. 0030–31.)

October 12, 2012. (App. 0031.) Consequently, the Closing[6] never occurred. Nevertheless, PSC did not issue a written notice of termination to CBE, which was required under Section 4.3.2 of the APA[7] in order for Buyer Default Termination to occur.[8] (App. 0031.)

Ultimately, PSC did not sell its assets to CBE, and instead, sold them to a third party pursuant to a different purchase agreement. (App. 0031.) On November 13, 2012, the Bankruptcy Court: (1) approved the sale of PSC's assets to the third party purchaser; and, (2) settled remaining claims to PSC's bankruptcy estate, including the Deposit. (App. 0438–59, 0462–71.) On January 24, 2013, the Bankruptcy Court converted PSC's Chapter 11 bankruptcy proceeding to a Chapter 7 liquidation, and the Trust Agreement transferred PSC's interest in the Deposit to CT. (App. 0472–81.) The Trust Agreement named Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") as the trustee of CT. (App. 0479.)

## B.    Procedural History

After the conversion of PSC's bankruptcy proceeding, CBE and CT litigated their competing claims to the Deposit and other issues in an adversary proceeding before the

---

[6] "Closing" refers to the closing of the transaction intended by the APA, which was scheduled to take place within two business days of the satisfaction of the conditions in (1) Section 4 of the APA; and, (2) the commitment letter of Great Eastern Investment Fund, LLC. (App. 0189.) No party disputes that a closing did not occur here.

[7] Section 4.3.2 of the APA provides that termination of the agreement is completed "by delivering to the [defaulting party] written notice of termination." (App. 0193.)

[8] Under the APA, Buyer Default Termination is defined as "[PSC's] termination of [the APA] under Section 4.3.2 as a result of the failure of a condition to [PSC's] obligations set forth in Section 4.1.1," which required that CBE maintain, to a material degree, all its representations, warranties, covenants, and obligations through Closing. (App. 0187.)

Bankruptcy Court.[9]  (CBE Br. 9–10; CT Br. 11.)  Following a September 2014 bench trial, the Bankruptcy Court entered judgment in favor of CT on CT's Complaint for CBE's breach of the APA, dismissed CBE's Counterclaim for CT's breach of the APA, and denied both parties' requests for legal fees.  (App. 0022.)  The Bankruptcy Court made several Findings, ultimately concluding that:  (1) CBE committed the first material, unwaived breach of the APA; (2) CBE's inability to close on the sale entitled CT to retain the Deposit; and, (3) neither party was entitled to attorneys' fees.  (App. 0018, 0021.)  Pillsbury retains the Deposit in its trust account.[10]  (CBE Br. 16.)

CBE timely noted its appeal of the Bankruptcy Court's judgment.[11]  (*See* ECF No. 17.) After receiving extensions of time, CBE and CT filed their respective briefs, and CBE filed its reply brief.  (ECF Nos. 31, 32, 35, 36.)

---

[9] On April 9, 2013, CT commenced the adversary proceeding by filing a one-count breach of contract Complaint against CBE for CBE's breach of the APA.  (CBE Br. 9.)  The Bankruptcy Court's decisions on summary judgment in *CBE III* were affirmed by the District Court, *CBE IV*, 2014 WL 6685494, at *3, and the United States Court of Appeals for the Fourth Circuit, *CBE V*, 606 F. App'x at 131; *see also supra* note 4.

[10] Section 2.1.2 of the APA, discussed in depth below, contemplated that the parties would execute an escrow agreement and escrow account for the Deposit.  The Bankruptcy Court did not err in finding that, in part because CBE chose to wire the deposit knowing the APA and escrow agreements had not been signed, the absence of an escrow agreement or account did not constitute default by PSC.  (App. 0004–05, 0018–19.)  The Bankruptcy Court found that the APA did not require one party or the other to establish or draft such documents, and CBE's choice to wire the funds prevents it from claiming default or error by PSC as to any escrow account.  *Id.* The record suggests that these funds remain available for distribution.

[11] On January 30, 2015, the Clerk's Office for the Bankruptcy Court filed the Amended Transmittal of Record on Appeal to District Court in this district court case.  (ECF No. 17.) Neither the original transmittal filed on January 20, 2015, nor the corrected transmittal filed on January 21, 2015, reflected either the correct notice of appeal date or the correct order that CBE appealed.  (ECF No. 1.)

## III. Analysis

Although the parties and the Bankruptcy Court viewed this case as turning on the determination of which party committed the first material, unwaived breach,[12] their approach overlooks an unambiguous provision in the APA,[13] which pertains in spite of the breach that occurred here:  CBE's failure to deliver its second $500,000 deposit as required by the APA. Section 2.1.2 of the APA delineates not only circumstances when PSC as the seller could keep the deposit,[14] but also when CBE, as the abortive purchaser, could receive its deposit back.[15] Contrary to the Bankruptcy Court's ruling, this case rides on the plain language of the APA.

---

[12] Without analysis of the plain language of the APA, the Bankruptcy Court stated: "This issue turns entirely on which party was the first to commit a material breach of the APA, which breach was not waived by the other party." (App. 002.)

[13] The Bankruptcy Court did not err in finding that the APA is sufficiently definite to be capable of enforcement. (App. 0002–06.)

[14] The aspect of Section 2.1.2 of the APA requiring return of the deposit to PSC, the seller, plainly states:

> The Deposit Escrow Holder shall deliver the Deposit (and any interest accrued thereon) to Seller upon the earlier of (A) Seller's termination of this Agreement under Section 4.3.2 as a result of the failure of a condition to Seller's obligations set forth in Section 4.1.1 (a "Buyer Default Termination"), or (B) the Closing.

(App. 0187.)

[15] The aspect of Section 2.1.2 of the APA requiring return of the deposit to CBE, the buyer, plainly states:

> The Deposit Escrow Holder shall return to Buyer the Deposit (and any interest accrued thereon) upon the earlier of (i) Buyer's termination of this Agreement under Section 4.3.2 as a result of the failure of a condition to Buyer's obligations, as set forth in Section 4.2, (ii) at the Outside Date, as extended pursuant to Section 3.2, and no Closing or Buyer Default Termination has occurred as of such date, (iii) mutual termination of this Agreement under Section 4.3.1, or (iv) the termination of this Agreement under Section 4.3.4.

(App. 0187.)

Even if CBE committed the first material breach of the APA, because PSC did not give written notice of termination, the APA directs that CBE is entitled to the Deposit.

While many contracts state—or presume—that a party, like CBE, who fails to deliver full financing loses its deposit, the APA at bar provided otherwise because it unmistakably required the seller, PSC, to give written notice of termination if CBE were to breach as it did here.[16] Accordingly, this Court must reverse the aspect of the Bankruptcy Court's decision finding that PSC's failure to issue a written notice of termination did not necessitate return of the Deposit to CBE. This case is remanded for further proceedings not inconsistent with this opinion.

A.      **Under Virginia Law, the APA Is Interpreted By Its Plain Meaning**

Under Virginia law,[17] it is well-established that "where an agreement is complete on its face, [and] is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself." *Capital Commercial Props., Inc. v. Vina Enters, Inc.*, 462 S.E.2d 74, 77 (Va. 1995) (citing *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983)) (holding that plain language in option to extend agreement did not require landlord to notify tenant of any defaults that tenant had not cured during the period in which tenant could have exercised its option to extend). Indeed, the Court is "not free to rewrite its terms." *Mgmt. Enters., Inc. v. Thorncroft Co.*, 416 S.E.2d 229, 231 (Va. 1992) (citing *Graphic Arts Mut. Ins. v. C.W. Warthen*

---

[16] The APA does not contain a forfeiture provision or a liquidated damages provision. Counsel for CBE argued to the Bankruptcy Court that counsel for PSC unsuccessfully tried, in a September 21, 2012 email exchange, to bargain for a liquidated damages or deposit forfeiture provision benefitting PSC that "was never agreed on." (App. 0111–12.) The appellate record does not contain the email exhibit referred to during oral argument. Even if the record revealed the reason the parties bargained for this deposit return provision, this Court could not rewrite the clear contractual agreement into which the parties entered.

[17] No party disputes the Bankruptcy Court's correct determination that Virginia law applies to this matter. (App. 0002.)

*Co.*, 397 S.E.2d 876, 877–78 (Va. 1990)). "This is so because the writing is the repository of the final agreement of the parties." *Capital Commercial Props., Inc.*, 462 S.E.2d at 77 (citing *Berry*, 300 S.E.2d at 796).

Importantly, "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning." *D.C. McClain, Inc. v. Arlington Cty.*, 452 S.E.2d 659, 662 (Va. 1995). "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Id.* Therefore, as is relevant in this matter, "[w]hen a contract provides for the performance of special conditions precedent before a party is entitled to payment, the conditions *must* be performed unless the other party prevents or waives their performance." *Winn v. Aleda Constr. Co.*, 315 S.E.2d 193, 195 (Va. 1984) (emphasis added) (citation omitted).

**B.     The Plain Language of Section 2.1.2 of the APA Required that PSC Issue a Written Notice of Termination in Order to Retain the Deposit**

The Bankruptcy Court found that PSC should receive the Deposit because CBE committed the first material, unwaived breach of the contract, meaning, under Virginia law, CBE could not enforce the terms of the contract and PSC should receive the Deposit. (App. 0007 (citing *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997).)[18] Given that the parties explicitly

---

[18] The APA's provision articulating when the deposit might be returned to PSC as the seller, or when it might go to CBE as the buyer, distinguishes this case from *Horton*, which both parties promoted as requiring the first material breach analysis in this case.

In *Horton*, the contract between the husband and wife did not include a provision controlling what would happen should one party breach. In the absence of such a contractual term, the *Horton* court turned to Virginia black letter law: the first party to commit a material, unwaived breach could not enforce the contract. In that case, the husband's non-performance flowed directly from the wife's material breach. *Horton*, 487 S.E.2d at 204.

Unlike the parties in *Horton*, CBE and PSC included in the APA an unambiguous proviso governing the disposition of the Deposit under certain circumstances, including Buyer Default Termination. Buyer Default Termination entitles a non-breaching party, like PSC, to the Deposit so long as it satisfies required conditions, such as written notice of termination. (App. 0187.)

extended "[a]ll of the provisions of the [APA] . . . in full force and effect in accordance with their original terms" on October 5, 2012, (App. 0395–97), and again on October 10, 2012, (App. 0399–401), this Court cannot reach the same legal conclusion. The plain language of the APA—extended through October 12, 2012—contained a provision governing the necessary conduct by the parties upon CBE's breach, which PSC failed to follow.

The APA determines whether CBE or PSC is entitled to the Deposit following the APA's termination. The plain language of Section 2.1.2[19] controls the outcome of the case at bar. As

---

[19] Section 2.1.2 provides, in full:

(i) Prior to or concurrently with the mutual execution and delivery of this Agreement on the date first written above (the "Execution Date"), Buyer shall deposit into escrow with an escrow agent (the "Deposit Escrow Holder") mutually agreed on by Seller and Buyer $500,000; and (ii) within fifteen (15) days of the Execution Date, Buyer shall deposit $500,000 into escrow with the Deposit Escrow Holder (collectively, the "Deposit") in immediately available, good funds (funds delivered in this manner are referred to herein as "Good Funds"), pursuant to an escrow agreement to be executed by Seller, Buyer and the Deposit Escrow Holder on or before the Execution Date. Such escrow agreement shall include the provisions set forth in this Section 2.1.2. Upon receipt of the Deposit, the Deposit Escrow Holder shall immediately deposit the Deposit into an interest-bearing account. The Deposit Escrow Holder shall return to Buyer the Deposit (and any interest accrued thereon) upon the earlier of (i) Buyer's termination of this Agreement under Section 4.3.2 as a result of the failure of a condition to Buyer's obligations, as set forth in Section 4.2, (ii) at the Outside Date, as extended pursuant to Section 3.2, and no Closing or Buyer Default Termination has occurred as of such date, (iii) mutual termination of this Agreement under Section 4.3.1, or (iv) the termination of this Agreement under Section 4.3.4. The Deposit Escrow Holder shall deliver the Deposit (and any interest accrued thereon) to Seller upon the earlier of (A) Seller's termination of this Agreement under Section 4.3.2 as a result of the failure of a condition to Seller's obligations set forth in Section 4.1.1 (a "Buyer Default Termination"), or (B) the Closing. The Deposit Escrow Holder's escrow fees and charges shall be paid one-half by Seller and one-half by Buyer, in which respect Seller and Buyer shall not be jointly liable since each shall only be liable for its own part (one-half) of the Deposit Escrow Holder's escrow fees and charges.

(App. 0186–87.)

explained below, because PSC never issued a written notice of termination, Section 2.1.2 requires availability of the $500,000 Deposit to CBE.

### 1.    Terms of the APA

Depending on the circumstances, the APA allowed either CBE or PCS to receive the deposit. The aspect of APA Section 2.1.2 that would require return of the Deposit to the buyer, CBE, provides in straightforward terms, articulated in subsections, that CBE should receive the Deposit upon the occurrence of the earliest of four events:  (i) upon CBE's termination of the APA under Section 4.3.2;[20] (ii) on the Outside Date, so long as no Closing or Buyer Default Termination has occurred prior to such date; (iii) upon mutual termination of the APA under Section 4.3.1; or, (iv) upon the termination of the APA under Section 4.3.4.  (App. 0187.) Subsection (ii) of Section 2.1.2, regarding the Outside Date, pertains to the analysis this Court undertakes.[21]

---

[20] Section 4.3.2, addressing the necessary written notice of termination to a defaulting party, states in full:

> If all conditions to Closing required to obligate a party to close the transactions set forth herein have been satisfied and such party has not tendered performance of its Closing obligations or deliveries hereunder on or before the Closing Date, **then the party who is not then in default hereunder may terminate this Agreement by delivering to the other written notice of termination.** Any waiver of a condition shall be effective only if such waiver is stated in writing and signed by the waiving party; *provided, however*, that the consent of a party to the Closing shall constitute a waiver by such party of any conditions to Closing not satisfied as of the Closing Date.

(App. 0193) (emphasis in bold added.)

[21]  By contrast, Section 4.3.1 of the APA, mentioned in Subsection (iii) of Section 2.1.2, provides that PSC and CBE "may terminate [the APA] by written mutual consent at any time prior to the Closing." (App. 0193.)  Neither party suggests that this provision pertains to this case, and the Bankruptcy Court correctly so found.
Section 4.3.4's severance provision, referenced in Subsection (iv), states that "[e]ither [PSC] or [CBE] may terminate [the APA] by written notice to other party(ies) pursuant to

Conversely, also under Section 2.1.2, PSC is entitled to the Deposit upon the occurrence

of the earlier of two clearly articulated events:  (1) PSC's termination of the APA under Section

4.3.2 as a result of the failure of a condition to PSC's obligations in Section 4.1.1, which, in

whole, constitutes Buyer Default Termination; or, (2) the Closing.  (App. 0187.)

The Bankruptcy Court correctly found the obvious:  Closing failed to occur.[22]  (App.

0020).  Further, the parties do not dispute that the outcome of the case turns on whether, prior to

the Outside Date,[23] CBE terminated the APA under Sections 4.3.2, 4.3.4, or 4.3.1.  Therefore,

---

Section 11.7."  (App. 0193.)  Section 11.7 articulates the terms under which the parties could
handle a void or illegal paragraph in the APA, among other things.  The Bankruptcy Court
correctly found that sections 4.3.4 and 11.7, referenced in Subsection (iv), do not control the
outcome of this appeal.  (App. 0211–212).

CBE contends that it ultimately terminated the APA under Subsection (iv) subsequent to
the November Outside Date, when CBE provided written notice of termination to PSC pursuant
to Sections 11.7 and 4.3.4, following PSC's sale of its assets to a third party.  (CBE Br. 26.)
According to CBE, this alleged termination of the agreement occurred on November 13, 2012.
(CBE Br. 27.)  Because Subsection (ii) controls, the Court will not address that contention on
appeal.

[22] The Bankruptcy Court decided that "CBE only had the right to a return of its Deposit
in the event of an unwaived Seller default, or had it closed under the APA."  (App. 0020.)

First, contrary to this conclusion, the APA plainly provides that PSC receives the Deposit
at Closing.  (App. 0187.)  Second, this finding essentially elides any "written notice" requirement
from the Buyer Default Termination process.  Such omission would render the APA's written
notice language meaningless, which this Court cannot do.

[23] The APA defines the Outside Date as 45 days after the Effective Date.  (App. 0189.)
The APA does not define "Effective Date."  The APA does, however, define "Execution Date,"
which is the date written on the APA.  (App. 0186.)  In this case, the Execution Date of the APA
was September 21, 2012.  (App. 0184.)  Here, the Court found no meaningful distinction between
the Execution and Effective Dates.  (App. 0002.)  This places the Outside Date at 45 days after
September 21, or at November 5, 2012.  This generally comports with the finding in CBE III that
the Outside Date was "November 6, 201[2]," a likely one-day miscalculation.  2014 WL
1661288, at *3.

Although, here, CBE takes issue with the Bankruptcy Court's finding regarding the
Effective and Execution Dates, (see CBE Br. 35), CBE likewise assumes that they are the same
when it argues that the Outside Date is November 5, 2012, (CBE Br. 17).  This Court does not
find that the Bankruptcy Court's determination of the Effective Date was in clear error.

this Court's determination hinges entirely on whether Buyer Default Termination occurred prior to the Outside Date. Specifically, if Buyer Default Termination occurred, PSC receives the Deposit. If, on the other hand, Buyer Default Termination did not occur, CBE receives the Deposit. In turn, the Court must determine what constitutes Buyer Default Termination.

**2. Section 2.1.2, and the Sections of the APA to Which it Refers Plainly, Require Written Notice for Buyer Default Termination**

Under the APA, Buyer Default Termination is defined as "[PSC's] termination of [the APA] under Section 4.3.2 as a result of the failure of a condition to [PSC's] obligations set forth in Section 4.1.1." (App. 0187.) Critically, Section 4.3.2 provides that termination of the APA is completed "by delivering to the [defaulting party] written notice of termination." (App. 0193.) Thus, in order for Buyer Default Termination to have occurred in this case, PSC must have complied with Section 4.3.2, which required that PSC provide to CBE written notice upon CBE's breach under Section 4.1.1.[24]

_____

[24] The Bankruptcy Court concluded that PSC "is entitled to the Deposit, unless [PSC] was in default." (App. 0019). The Bankruptcy Court's interpretation contradicts the plain language of the APA, which required, prior to the November Outside Date, either Closing or Buyer Default Termination in order for PSC to receive the Deposit.

Furthermore, this Court cannot affirm the Bankruptcy Court's determination that Sections 4.3.2 and 4.4.2 somehow alter Section 2.1.2's plain language. Section 4.3.2 simply provides that termination may be sought on or before the Closing Date. (App. 0193.) It does not suggest automatic Buyer Default Termination in the absence of Closing. Section 4.4.2, on the other hand, does not come into play *unless* a party terminates the APA under Section 4.3.2, which indisputably requires written notice for termination. (App. 0194.) Only then does the provision's requirement that "the Deposit Escrow Holder . . . deliver the Deposit to Seller" have effect. (App. 0194.)

### C.    PSC Failed to Issue to CBE a Written Notice of Termination Prior to the Outside Date and Is Therefore Not Entitled to the Deposit

As stipulated by the parties before the Bankruptcy Court, PSC failed to deliver to CBE a written notice of termination.[25] (App. 0031.) PSC's failure to do so, in turn, precluded the occurrence of Buyer Default Termination.[26] (*See* App. 0187.) Indeed, as discussed above, Buyer Default Termination is defined as "[PSC's] termination of [the APA] under Section 4.3.2," and Section 4.3.2 unequivocally required that PSC provide to CBE written notice upon CBE's breach under Section 4.1.1. (App. 0187, 0193.) PSC never provided CBE with written notice. Therefore, applying black letter principles of contract interpretation, Buyer Default Termination did not occur. Because Section 2.1.2 permitted delivery of the Deposit to PSC *only*

---

[25] Despite stipulating to "not serv[ing] notice of default or termination *of any kind* on CBE," (App. 0031 (emphasis added)), PSC now argues that the record adequately demonstrates that, in three instances, "sufficient writings" had been sent by PSC to CBE to satisfy any notice requirements. (CT Br. 21–22.) Those newly-raised arguments are not properly before this Court on appeal. The Bankruptcy Court made no findings as to any written notice from PSC or as to any waiver by CBE of this requirement.

At base, this Court can only state that the Bankruptcy Court's adoption of the parties' Joint Stipulations of Fact regarding the notice of default or termination notice does not constitute clear error. *See In re Harford Sands*, 372 F.3d at 639 (explaining that the Court reviews the Bankruptcy Court's factual findings for clear error).

[26] The written notice requirement was not, as PSC contends on appeal, a "futile and purposeless" act in light of what it characterizes as CBE's October 2, 2012 repudiation. (CT Br. 22.) Indeed, as evidenced by the parties' course of conduct, both CBE and PSC continued to treat their obligations as ongoing following CBE's notification that its funding fell through. (App. 0030–31 ("Pillsbury drafted an Amendment to the APA, which the parties signed on October 5, 2012, extending the deadline set forth in § 2.1.2(ii) of the APA through and including Wednesday, October 10, 2012. Potomac granted a further extension to Friday, October 12, 2012.").)

Moreover, the mutually agreed upon extensions of the APA are likewise fatal to PSC's argument that negotiations following the alleged October 2, 2012 repudiation reflected the creation of a new agreement. The parties explicitly extended "[a]ll of the provisions of the [APA] . . . in full force and effect in accordance with their original terms" on October 5, 2012, (App. 0395–97), and again on October 10, 2012, (App. 0399–401).

in the event of Closing or Buyer Default Termination, and neither event occurred, CBE is entitled to the Deposit.

## IV. Conclusion

CT can receive the benefit of the majority of the terms of the APA, but not all of them. The APA requires a written notice to establish a Buyer Default Termination, which PSC did not issue. For the foregoing reasons, the Court reverses the judgment of the Bankruptcy Court regarding PSC's failure to issue a Buyer Default Termination notice, and remands this case for further proceedings not inconsistent with this opinion. An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: 9-30-15